# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

***

|  |  |
|---|---|
| MARGARET PATTON, | |
| Plaintiff, | 2:12–cv–02142–GMN–VCF |
| vs. | |
| | **ORDER** |
| WAL-MART STORES, INC., | |
| Defendant. | |

Before the court is Plaintiff Margaret A. Patton's Motion for Sanctions for the Spoliation of Evidence (#26[1]). Defendant Walmart Stores, Inc. filed an opposition (#32); and, Patton replied (#34).

# BACKGROUND[2]

This matter arises out of Plaintiff Margaret Patton's slip and fall at a Walmart in Henderson, Nevada. (Pl.'s Mot. for Sanctions (#26) at 3:1–4). The relevant facts include: (1) the circumstances surrounding Patton's slip and fall; (2) the allegations in Patton's complaint; and (3) the events leading to the discovery dispute before the court. Each is discussed below.

---

[1] Pathetical citations refer to the court's docket.

[2] During the court's November 15, 2013 hearing, counsel stipulated to these facts, which the court read into the record in order to clarify the dispute before the court. The court notes that because this an interlocutory order, the stipulation was for the limited purpose of deciding the motion before the court. *See City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) ("As long as a district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient.").

1

## I. __Margaret Patton's Slip and Fall__

On June 10, 2011, Michael Burton—a Walmart stock employee—headed for aisle four. (Mins. Proceedings #49). The coffee merchandise needed replenishing. As Burton later testified, he pulled—and not pushed—his cart through the store. Burton had been trained to keep his back to the cart, remain alert, and be on the lookout for obstacles and broken items on the floor. (*Id.*)

Burton rounded the corner and pulled his cart into aisle four's east end. (*Id.*) A single customer was shopping for salad dressing at the far west end. (*Id.*) He passed the barbeque sauce and stopped in front of the coffee section. (*Id.*). As he would later recall, the floor appeared clean and dry to him. (*Id.*) Burton parked his cart, faced the shelf, and began stocking products. (*Id.*)

Minutes later, someone screamed. (*Id.*) Burton turned. (*Id.*) He saw Margaret Patton, near the barbeque sauce. (*Id.*) She was lying next to a large amount of liquid, just ten-to-fifteen feet away, along the very path Burton had just traversed one or two minutes before. (*Id.*) She was injured. (*Id.*)

Another employee arrived; he had heard the scream. (Pl.'s Mot. for Sanctions (#26) Exhibit B at 20:11–23). Onlookers gathered. (*Id.* at 20:21–22, 27:23). The other employee called the store manager, but he was unavailable. (*Id.* at 21:16) Soon an assistant manager arrived, and Burton left. (*Id.* at 22:5–7).

Burton resumed stocking shelves, but in another aisle. (*Id.*) Meanwhile, paramedics placed Patton on a stretcher and took her away. (Pl.'s Mot. for Sanctions (#26) Exhibit D at 31). She was immediately admitted to a hospital, where she would remain for over twenty-four hours. (*Id.* at 36:7–13). Later that day, Burton and the assistant manager completed written reports detailing Patton's fall, and the assistant manager requested that video surveillance be copied and preserved. (Pl.'s Mot. for Sanctions (#26) at 4:16–28, 5:5, 5:10–11).

## II.    **Patton Files Suit**

Twenty-six days later, Patton hired an attorney. (*See* Pl.'s Reply (#34) at 7:23–28). On July 6, 2011, the attorney sent Walmart a letter notifying the company that Patton was now represented. (*Id*.) The letter also instructed Walmart, in boldfaced type, to "ensure that any and all video surveillance tapes . . . pertaining to this matter remain completely undisturbed." (*Id*.) On July 19, 2011, Patton received a response. (*Id*.) Nicole Knysch of Sedgwich Claims Management Service, Inc., the claims handler for Walmart, confirmed that Patton's letter had been received. (*Id*. at 8:9–10) (citing (#34-4) Exhibit C at 1).

Approximately forty-five days after Patton's fall, on or about July 25, 2011, the digital memory in Walmart's surveillance system exceeded its capacity and the DVR system automatically overwrote previous data. (*See* Def.'s Opp'n (#32-2) Exhibit A, Aff. of Kelli Briggs, Asset Protection Manager at 3:7–10).

On October 29, 2012, Patton filed a negligence action in state court. (Compl. (#1-2) Exhibit B at 1). On December 17, 2012, Walmart removed the action to federal court. (*Id*. (#1) at 1). Patton alleges, among other things, that Walmart failed to properly inspect its floors. (Pl.'s Mot. for Sanctions (#26) at 6:14–18). In response, Walmart contends, among other things, that it breached no duty of care and that an unidentified shopper must have caused the spill that led to Patton's fall. (*Id*.)

## III.    **The Discovery Dispute & Walmart's Document Preservation Directive**

Discovery is now closed. One of the key facts that Patton attempted discover was the source of the liquid that caused Patton's slip and fall. In early April, Patton served Walmart with a request for production of documents, which demanded all surveillance footage of aisle four from the day in question. (Pl.'s Mot. for Sanctions (#26-6) Exhibit G at 4). But, Walmart did not produce any footage from before or during the accident because, Walmart argues, none exists. (*Id*.)

Pursuant to Walmart's "document preservation directive," (*see* Pl.'s Mot. (#26-5) Exhibit E), if video surveillance captures an incident in the store, Walmart preserves footage from one hour before the incident until the incident occurs. (Def.'s Opp'n (#32-2) Exhibit A, Aff. of Kelli Briggs at 3:16–17) (explaining how Walmart interprets and implements the document preservation directive). If, however, video surveillance does not capture an incident, then Walmart preserves footage from the area closest to the incident from the time the incident is reported until the customer exits. (*Id.* at 3:18–22). Following Patton's slip and fall, Walmart reviewed its surveillance footage but found nothing. (Def.'s Opp'n (#32) at 3:14–18). Because no camera captured Patton's slip and fall, Walmart preserved and produced video footage of the east entrance of aisle four from the time the incident was reported until one hour and six minutes later. (Pl.'s Mot. (#26) at 6:7–9).

On June 7, 2013, Patton deposed Burton. (*Id.* at Exhibit B). But, the deposition also failed to locate the liquid's source, in part, because Burton testified to following Walmart's policies perfectly: Burton kept his back to his cart and looked down the aisle for obstacles before turning to face the shelf and stock the coffee. (*Id.* at 37:1–3) ("I'm positive that it [*i.e.*, the water] wasn't there while I entered. It [*i.e.*, the spill] had to have occurred after I entered").

Patton moves for discovery sanctions, arguing that Walmart must have destroyed relevant evidence. Patton contends that it is axiomatic that Walmart had relevant video footage and that Walmart should have known to preserve the footage. (*See* Pl.'s Mot. (#26) at 7:3–7).

## LEGAL STANDARD

Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. *United States v. Kitsap Physicians Svs.*, 314 F.3d 995, 1001 (9th Cir. 2002) (citing *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991)) (a party engages in spoliation "as a matter of law only if they had 'some notice

4

that the documents were potentially relevant' to the litigation before they were destroyed"). A party must preserve evidence it knows or should know is relevant to a claim or defense of any party, or that may lead to the discovery of relevant evidence. *Kitsap Physicians Serv.*, 314 F.3d at 1001; *In re Napster*, 462 F. Supp. 2d 1060, 1067 (N.D. Cal. 2006) (citing *Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 556–57 (N.D. Cal. 1987) (noting, "[a]s soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action").

There are two sources of authority under which a district court can sanction a party who has despoiled evidence: the inherent power of federal courts to levy sanctions in response to abusive litigation practices, and the availability of sanctions under Rule 37 against a party who "fails to obey an order to provide or permit discovery." *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (citing *Fjelstad v. Am. Honda Motor Co., Inc.*, 762 F.2d 1334, 1337 (9th Cir. 1985); FED. R. CIV. P. 37(b)(2)(C). Federal courts sitting in diversity jurisdiction apply federal law when addressing issues of spoliation of evidence. *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir.1993) (applying federal law when addressing spoliation in diversity litigation); *accord Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009); *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001); *Reilly v. Natwest Mkts. Group Inc.*, 181 F.3d 253, 267 (2d Cir. 1999).

Where, as here, the moving party requests an adverse inference jury instruction,[3] the moving party must establish: (1) the party having control over the evidence had an obligation to preserve it at the

---

[3] Patton's papers present conflicting requests for relief. She states at various points that she moves the court for (1) "a rebuttal presumption," (*see* Pl.'s Mot. (#26) at 7:10), (2) a "mandatory presumption" (*see id.* at 8:25, 12:9), and (3) an adverse inference jury instruction, (*see id.* at 12:12); (*see also* Pl.'s Reply (#34) at 15:8). A rebuttable presumption requires a showing of intent to harm. *See, e.g.*, *Gonzalez v. Las Vegas Metro. Police Dept.*, No. 09–cv–0381, 2012 WL 1118949, at *2 (D. Nev. April 2, 2012). Because Patton did not argue intent, she failed to satisfy her burden. With regard to a mandatory presumption, the only authority Patton cites is from the Southern District of New York. (*See* Pl.'s Mot. (#26) at 8:25). This authority is persuasive, not controlling. Additionally, Patton did not present arguments regarding the elements of a mandatory presumption. (*See generally id.*) The

time it was destroyed; (2) the records were destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1078 (N.D. Cal. 2006) (citing *Hamilton v. Signature Flight Support Corp.*, No. C 05-0490, 2005 WL 3481423, at *3, 2005 U.S. Dist. LEXIS 40088 at *9 (N.D. Cal. Dec. 20, 2005); *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir.2002)).

## DISCUSSION

Patton moves the court to impose discovery sanctions on Walmart for destroying evidence relevant to her slip and fall. The threshold question that court must decide, therefore, is whether relevant evidence existed. *See, e.g.*, *Epstein v. Toys-R-Us Delaware, Inc.*, 277 F. Supp. 2d 1266, 1276–77 (S.D. Fla. 2003) (holding that to prevail on a motion for sanctions for the destruction of a videotape, the moving party must establish facts indicating that the video existed). If no relevant evidence existed, then Patton's motion is moot. If, however, relevant evidence did exist, then the question is whether Walmart had a duty to preserve the evidence. The court addresses each issue below.

## I.   <u>Relevant Evidence of Patton's Slip and Fall Existed</u>

The primary issue the court must address is whether relevant evidence existed. The court resolves this question by discussing, first, whether surveillance footage of aisle four actually existed and, second, whether the surveillance footage, if any, was relevant to Patton's complaint.

---

court, therefore, construes Patton's motion as requesting an adverse inference instruction. *See Med. Lab Mgmt. Consultants v. Am. Broad. Cos., Inc*., 306 F.3d 806, 824 (9th Cir. 2002) ("A federal trial court has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence.")

### A.    Surveillance Footage of Aisle Four Existed

Walmart insists, "**there was never any surveillance footage of the slip-and-fall incident or the surrounding area**" because no camera could have captured the slip and fall. (Def.'s Opp'n (#32) at 2:10–11, 5:1–4) (emphasis original). Walmart provides two affidavits with the following facts to substantiate this claim. (*See* Def.'s Opp'n (#32-2) Exhibit A, Aff. of Kelli Briggs, Asset Protection Manager; Dec. of Marjan Hajimirzaee). "PTZ Camera 5" was the nearest camera to aisle four. (*Id.*) PTZ signifies camera five's ability to pan, tilt, zoom, and turn 360 degrees. (*Id.*) Under normal conditions, PTZ Camera 5 could have captured the east entrance to aisle four. (*Id.*) But, on the day in question, two facts prevented PTZ Camera 5 from capturing relevant footage. (*Id.*) First, PTZ Camera 5 had preprogrammed default position focusing on aisles six and seven. (*Id.*) Second, a tall, mobile shelving structure, known as a "high velocity gondola," stood between aisles four and five and blocked PTZ Camera 5's view of the east entrance to aisle four. (*Id.*)

Patton's reply, however, includes a still image from a Walmart surveillance camera that shows the east entrance to aisle four on June 10, 2011. (*See* Pl.'s Reply (#34) at 5). According to Patton, "[a] paramedic and a stretcher are visible in the photograph." (*Id.* at 4:21–22). During the court's hearing, Walmart did not dispute that the image proffered by Patton is, in fact, an image of the east entrance to aisle four on June 10, 2011. (*See* Mins. Proceeings #49). The court, therefore, concludes that Patton has satisfied her burden of establishing that footage of aisle four existed. *See, e.g.*, *Epstein*, 277 F. Supp. 2d at 1276–77.

### B.    The Surveillance Footage of Aisle Four Contained Relevant Evidence

The court now turns to the question of whether the surveillance footage was relevant. Walmart argues that it was not relevant because (1) Patton fell ten-to-fifteen feet into aisle four where no camera monitored customer activity and (2) pursuant to its document preservation directive, Walmart reviewed

surveillance footage following the slip and fall but found nothing. (*See, e.g.*, Def.'s Opp'n (#32) at 3:14–19) ("Walmart did search for surveillance footage of Plaintiff's incident, . . . it was discovered that there was no camera shot of the slip-and-fall").

Walmart's arguments are unpersuasive. Under Walmart's document preservation directive, if video surveillance captures an incident in the store, Walmart preserves footage from one hour before the incident until the incident occurs. (Aff. of Kelli Briggs (#32-2) at 3:16–17). If, however, video surveillance does not capture an incident, then Walmart preserves footage of the area closest to the incident from the time the incident is reported until the customer exits. (*Id*. at 18–22). Following Patton's slip and fall, Walmart reviewed its surveillance footage, concluded that "nothing" was caught on film because Patton's fall was not caught on film. (*See* Def.'s Opp'n (#32) at 3:14–19). Walmart, therefore, produced video footage of the east entrance of aisle four for a period of one hour and six minutes after the fall was reported.

The initial problem with Walmart's argument, and its document preservation directive, is that Walmart made a conclusion—(*viz.* that "nothing" was caught on film)—that was not Walmart's to make. Whether "nothing" or "something" was caught on film is an evidentiary question of relevance. This determination is the court's, and not Walmart's, to make. *See* Fed. R. Evid. 401.

The overarching problem with Walmart's argument and its document preservation directive, however, is that "nothing" is something. Even if "nothing" was caught on film, camera five's video footage is probative because it tends to make the fact that Walmart maintained safe premises more probable than not. *See* Fed. R. Evid. 401. "Nothing" would show: (1) an empty and unobstructed east entrance; (2) rows of barbeque sauce and other liquids that had not fallen or leaked; and (3) a ceiling that kept water from dripping down and pudding on the floor. "Nothing," therefore, would be central to

8

Patton's negligence claim because nothing would tend to show that Walmart did not breach its duty of care.

Something rather than "nothing," however, was caught on film. The video footage from the time before Patton's fall was reported must have recorded Burton either pushing or pulling his cart. If Burton was pushing the cart, then camera five's video footage would tend to make Patton's allegation that Walmart failed to properly inspected aisle four more probable than not because Burton could not have seen obstructions, like a puddle of liquid, as he entered aisle four. *Id.* But, because Walmart's document preservation directive purportedly instructed employees to only preserve video footage after the incident was reported, Walmart's policy prevented Patton from discovering relevant evidence. In fact, assuming—as Walmart represents—that its employees implemented the document preservation directive correctly, then the policy itself demonstrates that Walmart destroyed relevant and probative evidence.

During the court's November 15, 2013 hearing, Walmart attempted to frame the issue raised by Patton's motion as really a complaint about not having enough evidence. (*See* Mins. Proceedings #49). Walmart insisted that it produced all relevant evidence in its possession and that granting Patton's motion would, in effect, create new law by imposing discovery obligations on responding parties that mandate the production of all evidence, not just relevant evidence. (*Id.*)

This is not the case. Patton does not seek all evidence that Walmart may have possessed. Patton seeks the most relevant and probative evidence that Walmart, in fact, possessed. Trial of this case will focus on causation. Patton moves for sanctions because Walmart destroyed the best evidence regarding the central issue. Granting Patton's motion, therefore, does not create new law. On the contrary, it affirms the heart existing law. Namely, that evidence of proximate cause is relevant to a negligence claim. *See, e.g.*, *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 344, 162 N.E. 99 (1928) (discussing

proximate cause); *see also Sprague v. Lucky Stores, Inc.*, 849 P.2d 320, 322 (Nev. 1993) (discussing premises liability and negligence under Nevada law).

## II.   <u>An Adverse Inference Jury Instruction is Warranted</u>

Having concluded that Walmart destroyed relevant surveillance footage of Patton's slip and fall, the court must now examine whether Patton has satisfied her burden of demonstrating that an adverse inference jury instruction is warranted. As discussed above, the party requesting an adverse inference jury instruction must establish: (1) the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) the records were destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1078 (N.D. Cal. 2006).

The court has already concluded that the lost surveillance footage is relevant to Patton's negligence claim. (*See supra* § I.B). The court, therefore, limits its discussion to whether Walmart had a duty to preserve the evidence and whether it destroyed the evidence with a culpable state of mind.

### A.   *Walmart had a Duty to Preserve the Relevant Evidence*

The duty to preserve arises not only during litigation, but also extends to the period before litigation when a party should reasonably know that evidence may be relevant to anticipated litigation. *In re Napster*, 462 F. Supp. 2d at 1067. A party must preserve evidence it knows or should know is relevant to a claim or defense of any party, or that may lead to the discovery of relevant evidence. *Kitsap Physicians Serv.*, 314 F.3d at 1001; *see also Nat'l Ass'n of Radiation Survivors*, 115 F.R.D. at 556–57 ("As soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action").

10

The parties dispute whether the following two events triggered Walmart's duty to preserve the video footage: (1) Walmart's document preservation directive; and (2) Patton's letter of representation, which directed Walmart to preserve "any and all video surveillance tapes . . . pertaining to this matter." (*See generally* Def.'s Opp'n (#32) 6–19); (*see generally* Pl.'s Reply (#34) at 6–14). The court discusses each below.

### 1.    Walmart's Document Preservation Directive Created a Duty to Preserve Evidence

Patton argues that Walmart had a duty to preserve video footage of aisle four from the period before the fall was reported "because [Walmart] has a protocol to preserve video surveillance." (Pl.'s Mot. (#26) at 9:25–26). In response, Walmart argues that there mere existence of a document preservation directive is insufficient to trigger a duty to preserve evidence. (Def.'s Opp'n (#32) 9–13).

Walmart's argument is correct. Patton cannot satisfy her burden by resting on the mere fact that Walmart adopted a document preservation policy. Patton must show that Walmart had notice that the video surveillance footage of aisle four before and during the fall "may be relevant to future litigation." *In re Napster*, 462 F. Supp. 2d at 1067; *see also Kitsap Physicians Serv*., 314 F.3d 995 at 1001. Accordingly, although the mere existence of Walmart's policy did not give Walmart notice that the June 10, 2011 footage "may be relevant to future litigation," the court holds that the manner in which Walmart decided to implement its document preservation directive did.

The manner in which Walmart implements its document preservation directive is facially suspect. As represented in Walmart's filings and at oral argument, if an incident occurs off camera, then Walmart automatically destroys—(or fails to preserve)—surveillance footage before or during the incident. (*See* Mins. Procceedings #49); (*see also* Aff. of Kelli Briggs, Walmart Asset Protection Manager (#32-3) at 3:18–22) ("[I]f our search revealed that there were no cameras that captured the

11

customer's incident, Store 2838's Asset Protection team preserved footage of the closest area to the incident and preserved footage from the time the incident was reported to management until the time the customer left the store."); (*see also* Def.'s Opp'n (#32) at 3:9–13) ("If, however, the search revealed that there were no cameras that captured the custom's incident, Store 2838's Asset Protection team preserved footage of the closest area to the incident and preserved footage from the time the incident was reported to management until the time the customer left the store.") (emphasis original).[4]

As discussed above, surveillance footage of a slip and fall is relevant even when the fall occurs off camera and "nothing" is captured on film. *See supra* § I.B (stating that the lost footage would (1) have captured the conditions of the east entrance of aisle four; (2) have recorded Burton either pulling his cart, and looking for obstacles along the way, or pushing his cart and—perhaps—overlooking the puddle of water that caused Patton's injuries; and (3) be essential to both Walmart's claim that it did not breach its duty of care and Patton's claim that Walmart failed to keep the premises reasonably safe). Walmart's document preservation directive, however, effectively states that footage of off-camera incidents is never relevant because the policy mandates that footage of off-camera incidents are deleted—(or failed to be preserved)—as a matter of course.

The assertion implied in Walmart's policy—*viz.*, that footage of off-camera incidents is never relevant—is untrue as a matter of law. Relevant evidence is not limited to direct evidence. It is well established that relevant evidence is broadly construed for both evidentiary and discovery purposes.

---

[4] There is a discrepancy between the actual language of Walmart's document preservation directive and how Walmart purportedly interprets it. In its filings and during the courts hearing, Walmart represented that the above quotations accurately reflect how the policy is implemented. (*See* Mins. Proceedings #49). The court, therefore, defers to Walmart's interpretation of its own policy. However, the record should reflect that the relevant portion of the directive, in fact, states: "SURVEILLANCE VIDEO (one hour before and one hour after) depicting area where the incident occurred and any condition (e.g., pallet, end-cap, cart, etc.) involved. If the incident involved an identified substance, also collect video from the area where any product containing the substance was displayed or sold. If none, explain." (*See* Document Preservation Directive (#26-5) at 1).

*See* FED. R. EVID. 401 (defining relevant evidence as evidence that has ***any*** tendency to make a fact of consequence more or less probable) (emphasis added); *see also City of Rialto v. U.S. Dept. of Defense*, 492 F. Supp. 2d 1193, 1202 (C.D. Cal. 2007) (defining discoverable information as information that has ***any possibility*** that the information sought may be relevant to the claim or defense of any party") (emphasis added). Walmart's document preservation directive ignores these well-settled principles and, thereby, impedes litigants from discovering relevant evidence.

During the court's hearing, Walmart argued that the court cannot conclude that Walmart should have known to preserve the footage because doing so requires imputing legal knowledge to Walmart's layperson employees. The court disagrees. First, Walmart itself requires layperson employees to comply with the law's discovery and evidentiary requirements. Its document preservation directive alters employees, in boldfaced type, to preserve all "potentially relevant" evidence because the company "may have a legal obligation to preserve information." (*See* Document Preservation Directive (#26-5) at 1). Second, the court does not need to impute legal knowledge to Walmart employees to conclude that Walmart should have known to preserve the footage because the footage is "relevant" under a common, everyday understanding of the word. *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 985 (10th ed. 2001) (defining "relevant" as "**1 a**: having significant and demonstrable bearing on the matter at hand  **b**: affording evidence tending to prove or disprove the matter at issue or under discussion.").

Accordingly, the court finds that Walmart's duty to preserve the footage arose when Walmart decided to implement the document preservation directive in the manner described by Walmart's Asset Protection Manager. (*See* Aff. of Kelli Briggs, Walmart Asset Protection Manager (#32-3) at 1–3) (explaining how Walmart implements the document preservation directive).

Walmart's document preservation directive mandates the destruction of potentially relevant evidence as a matter of course. Walmart's duty to preserve the evidence, therefore, attached the date

13

Walmart decided to destroy potentially relevant evidence as a matter of course because that date marks the first time Walmart knew or should have known that it would be destroying potentially relevant evidence. *Kitsap Physicians Serv.*, 314 F.3d at 1001 (citing *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991) ("Defendants engage in spoliation of documents as a matter of law only if they had 'some notice that the documents were potentially relevant' to the litigation before they were destroyed.").

It is unnecessary for the court to decide when, exactly, Walmart decided to implement the document preservation directive in the manner described by Walmart's Asset Protection Manager. It is sufficient for purposes of this motion that the directive was in place when Patton fell. (*See* Aff. of Kelli Briggs (#32-2 at 1–3). Similarly, because it is Walmart's standard operating procedure to destroy potentially relevant evidence, it is also unnecessary for the court to decide when Walmart had notice that Patton would sue. Walmart's policy existed when Patton entered the store.[5]

### 2.    Patton's Letter of Representation Created a Duty to Preserve Evidence

Alternatively, the court also concludes that Patton's letter of representation created a duty to preserve the surveillance footage of aisle four. As discussed above, on July 6, 2011, on Patton's attorney notified Walmart that she was represented and instructed the company, in boldfaced type, to "ensure that any and all video surveillance tapes . . . pertaining to this matter remain completely undisturbed." (*See* Pl.'s Reply (#34) at 7:23–28); (*see also* Ltr. of Rep. (#34-3) at 1). This occurred approximately nineteen days before Walmart's surveillance system exceeded its capacity and automatically overwrote previous data. (*See id.*); (*see also* Aff. of Kelli Briggs, Asset Protection Manager (#32-2) at 3:7–10) (discussing Walmart's DVR surveillance system).

---

[5] Although it is unclear when the footage was deleted, the last day that it could have been retained was July 25, 2011, forty-five days from Patton's June 10, 2011 fall. (*See* Def.'s Opp'n (#32-2) Aff. of Kelli Briggs, Asset Protection Manager at 3:7–10).

14

As a preliminary matter, Walmart argues that Patton is precluded from arguing that the letter of representation created a duty because the argument first appeared in Patton's reply brief. (*See* Mot. to Strike (#36) at 2) (citing *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.")). During the court's hearing, Walmart stated that if Patton properly raised this argument in her motion, then Walmart would have (1) obtained affidavits from Walmart employees demonstrating that Walmart never received the letter and (2) argued that the letter's phrase, "pertaining to this matter," is too vague to give sufficient notice of litigation. (*See* Mins. Proceedings #49).

These arguments are unpersuasive. Assuming, *arguendo*, that Walmart obtained affidavits and proffered briefs arguing that Patton's letter is "too vague" to give sufficient notice of litigation, the fact remains that the appropriate corporate representative, Sedwick CMS, Walmart's claims handler, actually received and understood the letter. (*See* Sedwick Ltr. (#34-4) at 1) ("Sedgwick Claims Management Services, Inc., is the claims handler for Wal-Mart Stores, Inc., and their insurance carrier concerning customer incidents. We have been advised you represent the above captioned customer and request that all correspondence and inquiries be directed to the attention of this office."). Patton's letter of representation, therefore, triggered Walmart's duty to preserve the evidence.

### B.     The Evidence was Destroyed with a Culpable State of Mind

The final inquiry the court must make to order an adverse inference jury instruction is whether Walmart destroyed the evidence with a culpable state of mind. The loss or destruction of evidence qualifies as willful spoliation if the party "has some notice that the documents were potentially relevant to the litigation" before they were lost. *Leon*, 464 F.3d at 959 (citing *Kitsap Physcians Serv.*, 314 F.3d at 1001). Conduct amounting to gross negligence is also sufficient culpability to justify an adverse inference instruction. *In re Napster*, 462 F. Supp. 2d 1078.

15

Both of standards are satisfied here. As discussed above, Walmart had notice that the surveillance footage was relevant to litigation before it was destroyed. On July 6, 2011, Patten sent Walmart her letter of representation. (Ltr. of Rep. (#34-3) at 1). On July 19, 2011, Walmart's claims handler responded. (*See* Sedwick Ltr. (#34-4) at 1). On or about July 25, 2011, the digital memory in Walmart's surveillance system exceeded its capacity and the DVR system automatically overwrote previous data. (*See* Aff. of Kelli Briggs, Asset Protection Manager (#32-2) at 3:7–10).

Additionally, the court finds that Walmart destroyed the surveillance footage with a culpable state of mind even if the footage was lost before Walmart received Patton's letter of representation. As discussed above, Walmart's document preservation directive makes the destruction of potentially relevant evidence standard operating procedure. (*See supra* § 2.A.1). This is reckless. *See* BLACK'S LAW DICTIONARY (9th ed. 2009) (defining "reckless" as "the creation of a substantial and unjustifiable risk of harm to others and by a conscious (and sometimes deliberate) disregard for or indifference to that risk; heedless; rash. • Reckless conduct is much more than mere negligence: it is a gross deviation from what a reasonable person would do.").

In sum, the court finds that an adverse inference jury instruction is warranted because Walmart's destruction of highly probative evidence interferes with the rightful decision of Patton's case. *In re Napster*, 462 F. Supp. 2d 1075; *Apple Inc. v. Samsung Elec. Co., Ltd*. 888 F.Supp.2d 976 (N.D. Cal. 2012).

ACCORDINGLY, and for good cause shown,

IT IS ORDERED that Plaintiff Margaret A. Patton's Motion for Sanctions for the Spoliation of Evidence (#26) is GRANTED.

IT IS FURTHER ORDERED that an adverse inference jury instruction against Walmart is appropriate sanction in these circumstances. No other sanctions will be imposed at this time.

16

Alternatively, if the trial court is not inclined to give an adverse inference instruction, another remedy for the missing video could be having the jury decide the appropriate inferences to be drawn from Walmart's handling of Patton's request to "ensure that any and all video surveillance tapes . . . pertaining to this matter remain completely undisturbed."

IT IS SO ORDERED.

DATED this 20th day of November, 2013.

_____
CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE

17